# LOAN AGREEMENT

This Loan Agreement (this "**Loan Agreement**") is made as of this 3rd day of January, 2024, by and among SQRL Aviation, LLC, a Florida limited liability company ("**Borrower**"); Joseph B. Smith, an individual citizen and resident of the State of Arkansas ("**Mr. Smith**"), and SQRL Holdings, LLC ("**Holdings**," and collectively with Mr. Smith, "**Guarantors**") and JB&B Capital, LLC, a Tennessee limited liability company, having an office at 109 S. Northshore Dr. Suite 200, Knoxville, TN 37919 ("**Lender**").

W I T N E S S E T H :

WHEREAS, Borrower has requested Lender to make a loan (the "**Loan**") to Borrower in the aggregate principal amount of $1,420,000.00 for the purpose of the partially refinancing Borrower's purchase of the following aircraft: one (1) Raytheon Aircraft Company Model 390 aircraft bearing U.S. registration number N311SQ and manufacturer's serial number RB-005, together with two (2) Williams Model FJ44-4A engines bearing manufacturer's serial numbers 1011 and 1012 (the "**Engine**"), which each exceed the equivalent of 550 rated takeoff horsepower or 1,750 or more pounds of thrust (the "**Aircraft**"); and

WHEREAS, Lender is willing to make such Loan, subject to the terms and conditions of this Loan Agreement.

NOW THEREFORE, in consideration of the covenants and promises herein contained, the parties agree as follows:

ARTICLE I:  AGREEMENT FOR THE LOAN

Section 1.01   Loan.  Subject to the terms and conditions of this Loan Agreement and the other Loan Documents (as hereinafter defined), Lender agrees to make a Loan to Borrower in the aggregate principal amount of $1,420,000.00 with respect to the Aircraft and Borrower agrees to borrow the same from Lender.

EXHIBIT A

ARTICLE II:  FINANCING TERMS

Section 2.01   Term.  The Loan under this Loan Agreement shall be evidenced by a Term Note (the "**Note**") delivered by Borrower to Lender.  The term of the Loan shall be 96 months from the Closing Date, at which time all outstanding amounts due shall be paid in full.

Section 2.02   Funding Amounts.  On the Closing Date (as hereinafter defined), Lender shall fund and loan to Borrower the sum of $1,420,000.00, which shall be paid as will be more specifically set forth in a payment proceeds letter or closing statement.

Section 2.03   Interest Rate.  The principal balance of the Loan outstanding at any time shall bear interest at a rate per annum as set forth in the Note.

Section 2.04   Principal and Interest Payments.  Except as expressly provided herein, principal and interest on the Loan shall be due and payable in the manner set forth in the Note.  The Loan may be prepaid in whole or in part, provided that Borrower complies with any requirements or conditions related to prepayment set forth in the Note.

Section 2.05   Late Charge; Interest Rate after Default.  If any payment under the Note is not made on the required due date, Borrower will be charged a late charge described in the Note.  From and after the date of any Event of Default (as hereinafter defined), any amounts due and owing under this Loan Agreement or the Note shall bear interest at the Default Rate described in the Note.  Notwithstanding the foregoing, the interest rate will not exceed the maximum rate permitted by applicable law.

Section 2.06   Net Payments.  All payments of any kind due to Lender from Borrower pursuant to this Loan Agreement shall be made in the full-face amount thereof, without setoff, counterclaim, or other defense.  All such payments will be free and clear of, and without deduction or withholding for, any present or future taxes.

Section 2.07   Evidence of Indebtedness.  The Loan made by Lender and Borrower's obligation to repay the Loan with interest in accordance with the terms of this Loan Agreement shall be evidenced by this Loan Agreement and the Note.

Section 2.08   Financial Statements.  Borrower and each Guarantor shall furnish to Lender, as applicable:

    (a)    Guarantors and Borrower: As soon as available, but in no event later than two hundred seventy (270) days after the year end for the tax reporting period ended, such Guarantor's Federal and other governmental tax returns, prepared by Guarantor, in form and substance satisfactory to Lender;

    (b)    Guarantors: as soon as available, but in no event later than ninety (90) days after the end of each calendar quarter, such Guarantor's balance sheet or personal financial statements (as applicable), for the quarter ended, in form and substance satisfactory to Lender, in reasonable detail and form and substance

>> reasonably acceptable to Lender, on a comparative basis with corresponding statement for the prior quarter; and
>
> (c) Guarantors and Borrower: from time to time, upon the request of Lender, such other information as Lender may require.

Any failure of Borrower or Guarantors to comply with these covenants at any time shall be an event of default hereunder.

Section 2.09   <u>Yearly Aircraft Reports; Inspections and Audits</u>.  At the request of Lender and by December 31st each year during the term of the Loan, or more frequently if reasonably requested by Lender or if an Event of Default has occurred that is continuing, Borrower, at Borrower's expense, shall cause to be prepared and delivered to Lender or shall obtain and deliver to Lender annual third-party inspections of the Aircraft, to include a check of log books, airworthiness items, and scheduled maintenance, as well as a visual inspection of the interior and exterior of the Aircraft and photographs, all issued by such qualified individuals or companies and in such form and substance acceptable to Lender and not containing exceptions unacceptable to Lender.  Lender may inspect the Aircraft, its records and logbooks, or any other item pertaining to the foregoing at any time and from time to time.

Section 2.10   <u>Maintenance</u>.  Borrower shall maintain and keep the Aircraft in good order and repair and in airworthy condition in accordance with the requirements of each of the manufacturers' manuals and mandatory service bulletins.  Borrower shall cover the maintenance reporting under a third-party computerized maintenance tracking program, at its expense.

Section 2.11   <u>Origination Fee</u>.  Borrower shall pay to Lender a non-refundable origination fee in the amount of $14,200 at Closing.

ARTICLE III:  SECURITY FOR THE LOAN

Section 3.01   <u>Note and Security Interest</u>.  At all times during the term hereof and until all obligations pursuant hereto are performed, and all sums owing pursuant hereto are paid in full, the Loan and the Note shall be secured by the Aircraft; the Irrevocable Guarantees of the Guarantors (the "**Guarantees**"); the Aircraft Mortgage and Security Agreement (the "**Security Agreement**") by and between Borrower and Lender; the Security Assignments of any lease agreements (collectively, the "**Lease Assignment Agreements**"); (collectively, the "**Collateral**").  This Loan Agreement, the Note, the Guarantees, the Security Agreement, and the Lease Assignment Agreements; together with any and all other documents executed by Borrower or any Guarantor securing repayment of the Loan are collectively referred to herein as the "**Loan Documents**."

ARTICLE IV:  REPRESENTATIONS, WARRANTIES AND INDEMNIFICATIONS.

In order to induce Lender to enter into this Loan Agreement and to make the Loan, Borrower and Guarantors, to the extent applicable to it, makes the representations, warranties, and indemnifications hereinafter set forth in this Article IV.

Section 4.01    <u>Indemnity</u>.  Borrower shall indemnify Lender and its affiliates, and hold Lender and its affiliates harmless from any loss, cost or expense whatsoever arising from the breach of any of Borrower's covenants or other obligations set forth in this Loan Agreement or any other Loan Document.

Section 4.02    <u>Status and Authority</u>.

(a) Borrower (i) is a limited liability company, duly registered and validly existing under the laws of the state of its formation; (ii) as of the date of this Loan Agreement, is situated in a Contracting State, as defined in the Cape Town Convention (as defined below), (iii) has the power to execute, deliver and carry out the terms and provisions of the Loan Documents to which it is a party, and (iv) has taken all necessary action to authorize the execution of the Loan Documents to which it is a party and to consent to the registration of the international interest arising under this Loan Agreement with the International Registry (as defined below).  The Loan Documents to which it is a party have been duly executed and delivered by Borrower and constitute the legal, valid, and binding obligations of Borrower, enforceable in accordance with their respective terms, except to the extent that enforcement may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to the application or limitation of equitable principles by a court of competent jurisdiction.

(b) Mr. Smith (i) is an individual resident of the State of Arkansas; (ii) has the power to execute, deliver and carry out the terms and provisions of the Loan Documents to which he is a party, and (iii) has taken all necessary action to authorize the execution of the Loan Documents to which he is a party.  The Loan Documents to which he is a party have been duly executed and delivered by Mr. Smith and constitute the legal, valid, and binding obligations of Mr. Smith, enforceable in accordance with their respective terms, except to the extent that enforcement may be limited by any applicable bankruptcy or other similar laws affecting creditors' rights generally and subject to the application or limitation of equitable principles by a court of competent jurisdiction.

(c) Holdings is a limited liability company, duly registered and validly existing under the laws of the state of its formation; (ii) has the power to execute, deliver and carry out the terms and provisions of the Loan Documents to which it is a party, and (iii) has taken all necessary action to authorize the execution of the Loan Documents to which it is a party. The Loan Documents to which it is a party have been duly executed and delivered by Holdings and constitute the legal, valid, and binding obligations of Holdings, enforceable in accordance with their respective terms, except to the extent that enforcement may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to the application or limitation of equitable principles by a court of competent jurisdiction.

Section 4.03    Material Liabilities.  There has been no material adverse change in the operations, business, property, assets or condition (financial or otherwise) of Borrower or any Guarantor since the date of the financial statements heretofore provided by Borrower to Lender.

Section 4.04    Use of Proceeds.  Proceeds of the Loan shall be used to refinance Borrower's prior acquisition of the Aircraft.

Section 4.05    USA Patriot Act.  Borrower represents and warrants that it is not a foreign shell bank, as defined in the USA Patriot Act (defined in Section 7.15) and is not being used by a foreign bank to indirectly provide banking services to another foreign bank that does not have a physical presence in any country.

ARTICLE V:  CONDITIONS TO CLOSING AND POST-CLOSING COVENANTS OF BORROWER.

In addition to the terms and conditions otherwise contained herein, the making of the Loan is subject to the satisfaction of the conditions contained in this Article V. The date on which the conditions are satisfied, and the Loan is made is hereinafter referred to as the "**Closing Date**."

Section 5.01    No Default.  Neither Borrower, nor any Guarantor, nor any other party shall be in default under any Loan Documents.

Section 5.02    Representations and Warranties.  The representations and warranties contained in the Loan Documents shall be true and correct in all respects.

Section 5.03    Delivery of Documents.  Borrower shall have delivered to Lender the following documents:

   (a)   a duly executed original of each of the Loan Documents;

   (b)   certificates of existence and good standing of Borrower;

   (c)   copies of the Operating Agreement and Articles of Organization of Borrower;

   (d)   a copy of the resolutions of Borrower authorizing the Loan and the execution of the Loan Documents;

   (e)   evidence that Borrower has become a transacting user entity with the International Registry and appointed an administrator and a professional user entity to act on Borrower's behalf;

   (f)   evidence that good title to the Aircraft is in the name of Borrower;

   (g)   evidence that Borrower has obtained the insurance required by Section 3.4 of the Security Agreement;

5

(h) a duly executed Agreement to Provide Insurance detailing Borrower's commitment to provide insurance coverage as to the Aircraft in form and substance acceptable to Lender in Lender's sole discretion (the "Agreement to Provide Insurance");

(i) an Irrevocable De-Registration and Export Request Authorization in favor of Lender (the "**IDERA**");

(j) a duly executed Irrevocable Power of Attorney in Fact (Aircraft Registration) in favor of Lender; and

(k) such additional documentation which may be requested by Lender.

### ARTICLE VI: EVENTS OF DEFAULT; REMEDIES

Section 6.01   Events of Default.  The occurrence of any of the following events shall constitute an "**Event of Default**" under this Loan Agreement:

(a) Borrower fails to make any payment when due under the Note;

(b) default by Borrower in the payment of any other amounts payable under this Loan Agreement and such default shall continue for a period of ten (10) days after Borrower is notified in writing of such default;

(c) the occurrence of an "Event of Default" under any Loan Document;

(d) any Loan Document shall cease to be in full force and effect or shall, if applicable, cease to give to Lender the rights and interests purported to be created thereunder;

(e) the Collateral or any portion thereof shall be seized or confiscated by any governmental authority for any reason whatsoever for a period of more than thirty (30) consecutive days, or the Lender's interest in the Collateral shall for any reason cease or otherwise fail to be a valid and subsisting first priority lien in favor of the Lender;

(f) the failure by Borrower to maintain the insurance coverage on the Aircraft in accordance with the requirements set forth in the Agreement to Provide Insurance;

(g) Borrower or any Guarantor fails or becomes unable generally to pay its, his or her debts as they come due, makes an assignment for the benefit of creditors, has a compulsory winding up order made against it, him or her or resolves to be wound up voluntarily, files a petition in bankruptcy or for relief under any bankruptcy or insolvency law, is adjudicated insolvent or bankrupt, petitions or applies to any tribunal for any receiver of or any trustee for such company or any substantial part of its, his or her property, commences any proceeding

(h)     relating to such company under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction whether now or hereafter in effect, or if there is commenced against Borrower or any Guarantor any such proceeding and not dismissed within thirty (30) days thereafter;

(h)     any representation, warranty or statement made by Borrower or any Guarantor in this Loan Agreement, or any other Loan Document or any notice or other document, certificate or statement delivered by Borrower or any Guarantor pursuant hereto or in connection herewith is or proves to have been misleading in any material respect when made;

(i)     If at any time during the term of this Loan Agreement, there is a change of control of Borrower. For purposes of this subsection, the term "change of control" shall mean and include (1) the voluntary, involuntary, direct, or indirect assignment, sale or other transfer of fifty-one percent (51%) or more of the equity ownership of Borrower to a party that is not an affiliate of Borrower; (2) the merger or consolidation of Borrower with another entity that is not an affiliate of Borrower; or (3) the sale or issuance of limited liability company interests or other securities of Borrower which equals or exceeds fifty-one percent (51%) of the existing outstanding limited liability company interests of Borrower as of the date of this Loan Agreement to a party that is not an affiliate of Borrower;

(j)     Borrower or any Guarantor suspends or ceases or threatens to suspend or cease to carry on a material part of its business or sells, assigns or transfers a material portion of its assets to any third party;

(k)     the occurrence of an event of default of Borrower or any Guarantor under any other agreement between Borrower or any Guarantor and Lender or any of Lender's affiliates or subsidiaries; or

(l)     Any of the foregoing events shall occur with respect to any Guarantor, as applicable;

(m)     Death or dissolution of a Guarantor; or

(m)     default by Borrower of any terms or provisions of this Loan Agreement (other than as set forth in subparts (a) through (l) above), or any other Loan Document and such default shall continue for a period of thirty (30) days after Borrower has been notified in writing of such default;

then upon the occurrence and during the continuation of any of the foregoing Events of Default, the Note and all amounts under this Loan Agreement shall become and be immediately due and payable upon Lender having given Borrower notice of such acceleration, and Lender shall be entitled to all other remedies available herein, in any other Loan Document, or at law or in equity; provided,

however, that upon the occurrence of an Event of Default specified in (i) above, the Note and all amounts under this Loan Agreement shall automatically become due and payable without notice or demand of any kind, all of which are expressly waived by Borrower. Except as set forth in the immediately preceding sentence and this paragraph, Borrower and each Guarantor expressly waive any presentment, demand, protest or other notice of any kind. Further, the Lender shall have the right to the appointment of a receiver to take possession of Borrower's premises, properties, assets, books and records, without consideration of the value of the collateral pledged as security for the Loan and extensions of credit or the solvency of any person liable for the payment of the amounts then owing, and all amounts collected by the receiver shall, after expenses of the receivership, be applied to the payment of the Loan indebtedness, extensions of credit, and interest thereon; and the Lender, at its option, shall have the right to do the same, without the appointment of a receiver. All such rights and remedies are cumulative and nonexclusive, and may be exercised by the Lender concurrently or sequentially, in such order as the Lender may choose.

## ARTICLE VII: MISCELLANEOUS PROVISIONS

Section 7.01  **GOVERNING LAW. THIS LOAN AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TENNESSEE, WITHOUT REFERENCE TO ITS CONFLICTS OF LAW PROVISIONS.**

Section 7.02  Jurisdiction; Service of Process; Waiver of Immunity and Jury Trial. Any legal action or proceeding against Borrower with respect to the Loan Documents to which it is a party may be brought in such of the courts of competent jurisdiction and venue of the State of Tennessee or the United States District Court sitting in Knoxville, Tennessee as Lender or its respective successors and permitted assigns, as the case may be, may elect, and by execution and delivery of the Loan Documents to which it is a party, Borrower irrevocably submits to the exclusive jurisdiction of such courts, and to appellate courts therefrom, for purposes of legal actions and proceedings under each Loan Document and, in the case of any such legal action or proceeding brought in the above-named Tennessee courts, hereby irrevocably consents, during such time, to the service of process out of any of the aforementioned courts in any such action or proceeding by any means permitted by applicable law and that, for avoidance of doubt, the provisions of this sentence relative to service of process shall take priority in the event of any inconsistency between this Loan Agreement and the other Loan Documents. Borrower agrees that the above-named Tennessee courts have non-exclusive personal jurisdiction in respect of a claim brought under the Cape Town Convention (if applicable at any time) relating to the Aircraft. The foregoing, however, shall not limit the rights of Lender to serve process in any other manner permitted by law or to bring any legal action or proceeding or to obtain execution of judgment in any jurisdiction. Borrower further agrees that final judgment against Borrower in any action or proceeding in connection with the Loan Documents to which it is a party shall be conclusive and may be enforced in any other jurisdiction within or outside the United States of America by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and the amount of Borrower's indebtedness. **TO THE EXTENT THAT BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY OF THE ABOVE-NAMED COURTS OR FROM ANY LEGAL PROCESS THEREIN, BORROWER HEREBY IRREVOCABLY**

**WAIVES SUCH IMMUNITY, AND BORROWER HEREBY IRREVOCABLY WAIVES AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE, OR OTHERWISE, IN ANY LEGAL ACTION OR PROCEEDING BROUGHT HEREUNDER IN ANY OF THE ABOVE-NAMED COURTS (I) ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE ABOVE-NAMED COURTS, (II) THAT IT OR ANY OF ITS PROPERTY IS IMMUNE FROM THE ABOVE DESCRIBED LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION, OR OTHERWISE), (III) THAT SUCH ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, THAT VENUE FOR THE ACTION OR PROCEEDING IS IMPROPER OR THAT THE LOAN DOCUMENTS TO WHICH IT IS A PARTY MAY NOT BE ENFORCED IN OR BY SUCH COURTS, OR (IV) ANY DEFENSE THAT WOULD HINDER OR DELAY THE LEVY, EXECUTION OR COLLECTION OF ANY AMOUNT TO WHICH EITHER PARTY HERETO IS ENTITLED PURSUANT TO A FINAL JUDGMENT OF ANY COURT HAVING JURISDICTION. NOTHING IN THIS SECTION 7.02 SHALL LIMIT ANY RIGHT OF LENDER TO BRING ACTIONS, SUITS OR PROCEEDINGS IN THE COURTS OF ANY OTHER JURISDICTION. BORROWER EXPRESSLY ACKNOWLEDGES THAT THE FOREGOING WAIVER IS INTENDED TO BE IRREVOCABLE. BORROWER AND LENDER EACH HEREBY WAIVES ANY RIGHT WHICH IT MAY HAVE TO REQUEST A TRIAL BY JURY IN ANY ACTION RELATING TO THE LOAN DOCUMENTS, AND FURTHER AGREE THAT WITH REGARD TO SAID JURY TRIAL WAIVER, THAT THE MUTUAL JURY TRIAL WAIVER AS CONTAINED IN THIS LOAN AGREEMENT SHALL TAKE PRIORITY OVER ANY INCONSISTENCIES IN ANY OF THE OTHER LOAN DOCUMENTS RELATIVE TO JURY TRIALS.**

Section 7.03    <u>Severability</u>.  If any part of this Loan Agreement is contrary to, prohibited by, or deemed invalid under any applicable law of any jurisdiction, such provision shall, as to such jurisdiction, be inapplicable and deemed omitted to the extent so contrary, prohibited, or invalid, without invalidating the remainder hereof or affecting the validity or enforceability of such provision in any other jurisdiction.  In the event of any conflict between any Cape Town Convention provisions in this Loan Agreement and any provisions in this Loan Agreement not related to the Cape Town Convention, the provisions relating to the Cape Town Convention shall prevail.

Section 7.04    <u>Counterparts</u>.  This Loan Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument, and all signatures need not appear on any one counterpart.  Facsimile signatures and electronic signatures of the parties hereto shall be binding.  Notwithstanding the foregoing, in the event Lender requests that Borrower provide an originally executed copy of a document, Borrower shall promptly provide the same, and upon Borrower's failure to do so within ten (10) days following notice thereof, Lender may declare the same to constitute an Event of Default.

Section 7.05    <u>Notice</u>.  Any notice or other communication required or permitted under this Loan Agreement or necessary or convenient in connection with this Loan Agreement shall be sent by registered or certified mail, return receipt requested, or by international courier delivery service, and

shall be deemed duly given upon actual receipt and shall be addressed as follows:

  If to Lender:     JB&B Capital, LLC
              109 S Northshore Drive
              Knoxville, Tennessee 37919
              Attention:

  If to Borrower:     SQRL Aviation, LLC
              27 Rahling Circle
              Suite C
              Little Rock, Arkansas 72223

or to such address or addressee as either party from time to time shall designate by written notice to the other.

  Section 7.06  <u>Benefit of Agreement</u>.  This Loan Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties and their respective successors in interest and permitted assigns; provided however, that Borrower shall not assign or transfer any interest or delegate any duty hereunder without the prior written consent of Lender.  Lender shall have the absolute right to assign or transfer any interest herein or in the other Loan Documents, including, without limitation, the right to sell participation interests in the Loan.

  Section 7.07  <u>Further Documentation</u>.  The parties hereto agree that from time to time after the Closing Date, Borrower shall execute and deliver to Lender such further document or documents as Lender may reasonably request and which is or are necessary or desirable in order to confirm, further evidence the respective obligations of Borrower and/or the rights and privileges of Lender under this Loan Agreement or the other Loan Documents, or carry out the intent of the parties under this Loan Agreement or the other Loan Documents.  Without limiting the generality of the foregoing, the parties hereto undertake to enter into, execute and deliver such documents as may be necessary or desirable to constitute an international interest under the Cape Town Convention.  Particularly in the case of any amendment, waiver or consent pursuant to Section 7.09 hereof, the parties undertake to enter into, execute and deliver such documents as may be necessary or desirable to enhance the enforceability of the commercial agreements of the parties under the Cape Town Convention to the greatest extent permitted under the Cape Town Convention, such that Lender's priority position should not be prejudiced thereby.

  Section 7.08  <u>Expenses/Indemnification</u>.  Borrower shall, on demand, pay or reimburse Lender for all of Lender's reasonable costs and expenses (including, without limitation, reasonable fees and disbursements of legal counsel, pre-funding inspection, appraisal and inspection of the Collateral, background searches and investigative searches as may be required by Lender, FAA and international Registry filing fees, and all UCC filing and search fees incurred), and all payments made relating thereto (the "**Transaction Expenses**").  In addition, Borrower shall indemnify and hold Lender harmless from and against all losses suffered by Lender in connection with, arising out of, or in any way related to (i) protecting, preserving, exercising or enforcing any of the rights of

Lender under this Loan Agreement or the other Loan Documents, including, without limitation, the registration of an international interest with the International Registry; and (ii) any claim (whether asserted by Lender or Borrower or any other person) and the prosecution or defense thereof, in any way arising under, related to, or connected with, this Loan Agreement or the other Loan Documents or the relationship established hereunder; provided, however, such indemnification obligations shall not apply to any act or omission involving a breach of this Loan Agreement by Lender and shall not apply to any act or omission involving gross negligence or willful misconduct by Lender or its representatives.

Section 7.09   <u>Waivers; Amendments</u>.  Any term, covenant, agreement or condition of this Loan Agreement or the other Loan Documents may be amended or waived, and any departure therefrom may be consented to, if, but only if, such amendment, waiver or consent is in writing and is signed by Lender and, in the case of an amendment, by Borrower.  Unless otherwise specified in such waiver or consent, a waiver or consent given hereunder shall be effective only in the specific instance and for the specific purpose for which given.

Section 7.10   <u>Set-Off</u>.  Upon and after the occurrence of any Event of Default, Lender and each of its affiliates is hereby authorized by Borrower and the Guarantors, at any time and from time to time, without notice, (a) to set off against, and to appropriate and apply to the payment of, the obligations and liabilities of Borrower under this Loan Agreement and the other Loan Documents (whether matured or unmatured, fixed or contingent or liquidated or unliquidated) any and all amounts owing by Lender or any such affiliate to Borrower or the Guarantors (whether payable in United States Dollars or any other currency, whether matured or unmatured, and, in the case of deposits, general or special, time or demand and however evidenced) and (b) pending any such action, to the extent necessary, to hold such amounts as collateral to secure such obligations and liabilities.

Section 7.11   <u>Limitation of Liability</u>.  No claim may be made by Borrower against Lender or its affiliates, directors, officers, employees, attorneys or agents for any special, indirect, consequential or punitive damages in respect of any breach or wrongful conduct (whether the claim therefor is based on contract, tort or duty imposed by law) in connection with, arising out of or in any way related to the transactions contemplated and relationships established by this Loan Agreement or the other Loan Documents, or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any such claim for any such damages, whether or not accrued and whether or not known or suspected.

Section 7.12   <u>Entire Agreement</u>.  This Loan Agreement and the other Loan Documents embody the entire agreement between Borrower and Lender and supersede all prior agreements, representations and understandings, if any, relating to the subject matter hereof, including, without limitation, any proposal that may have been presented by Lender to Borrower.

Section 7.13   <u>Currency</u>.  The payment obligations of Borrower under this Loan Agreement and the other Loan Documents shall not be discharged by an amount paid in currency other than United States Dollars, whether pursuant to a judgment or otherwise.  To the extent that the amount so paid on prompt conversion to United States Dollars and transfer to the specified place of payment

under normal banking procedures does not yield the amount of United States Dollars in such place due under this Loan Agreement and the other Loan Documents, Borrower shall indemnify Lender and any obligee against any such shortfall.  In the event that any payment, whether pursuant to a judgment or otherwise, upon conversion and transfer does not result in the payment of such amount of United States Dollars in the specified place of payment, the obligee of such payment shall have a claim against Borrower for the additional amount necessary to yield the amount due and owing under this Loan Agreement and the other Loan Documents and is a separate cause of action.

Section 7.14    Cape Town Definitions.  For purposes of this Loan Agreement, "**Cape Town Convention**" shall mean, collectively, the official English language text of the convention on International Interests in Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, adopted on November 16, 2001, at a diplomatic conference in Cape Town, South Africa.  Any reference in this Loan Agreement to a provision, section or article of the Cape Town Convention shall be a reference to the Consolidated Text of the Cape Town Convention and to the corresponding provision, section or article of the documents described in the immediately preceding sentence from which the Consolidated Text of the Cape Town Convention is derived.  "**International Registry**" shall mean the international registry located in Dublin, Ireland, established pursuant to the Cape Town Convention.

Section 7.15    Patriot Act Data.  Borrower shall, with reasonable promptness, provide to Lender all information and data with respect to Borrower and/or any of its affiliates as from time-to-time may be required for Lender to comply with the USA Patriot Act, with the understanding that Lender may share information with the United States government for the purpose of identifying or reporting suspected terrorism or money laundering.  The USA Patriot Act for purposes of this Loan Agreement means The USA Patriot Act (P.L. 107-56), as amended or modified from time to time, and the regulations promulgated thereunder.

Section 7.16    Time of Essence.  Time is of the essence of the Borrower's obligations under this Loan Agreement, the Note, and the other instruments and documents executed and delivered in connection herewith.

Section 7.17    Compromises, Releases, Etc.  Each Guarantor agrees that:

(a)    The Lender is hereby authorized from time to time, without notice to anyone, to make any sales, pledges, surrenders, compromises, settlements, releases, indulgences, alterations, substitutions, exchanges, changes in, modifications, or other dispositions including, without limitation, cancellations, of all or any part of the Loan indebtedness, or of any contract or instrument evidencing any thereof, or of any security or collateral therefor, and/or to take any security for or other guaranties upon any of said indebtedness; and the liability of the Guarantor shall not be in any manner affected, diminished, or impaired thereby, or by any lack of diligence, failure, neglect, or omission on the part of Lender to make any demand or protest, or give any notice of dishonor or default, or to realize upon or protect any of said indebtedness or any collateral or security therefor.

(b)    The Lender shall have the exclusive right to determine how, when, and what

       application of payments and credits, if any, shall be made on the Loan and extensions of credit or any part thereof, and shall be under no obligation, at any time, to first resort to, make demand on, file a claim against, or exhaust its remedies against the Borrower, or its property or estate, or to resort to or exhaust its remedies against any collateral, security, property, liens, or other rights whatsoever.

    (c)    The Lender may at any time make demand for payment on, or bring suit against, the Borrower and/or any Guarantor, jointly or severally, and may compromise with the Borrower or the Guarantor for such sums or on such terms as it may see fit, without notice or consent, the same being hereby expressly waived.

    (d)    Any claims against the Borrower accruing to the Guarantor by reason of payments made to the Lender shall be subordinate to any indebtedness now or at any time hereafter owing by the Borrower to the Lender, Guarantor hereby waiving all rights of subrogation against the Borrower until all indebtedness, liabilities and obligations of the Borrower to the Lender shall have been fully and finally paid and satisfied.

Section 7.18   <u>Joinder of Guarantor</u>.  Each Guarantor joins herein for the purpose of acknowledging and consenting to the terms and provisions hereof (and especially the provisions of Section 7.17), and does further, jointly and severally, absolutely and unconditionally guarantee the payment and performance of each and every obligation and undertaking of the Borrower hereunder.

Section 7.19   <u>Assignments and Participations</u>.  Lender may sell or offer to sell the Loan or interests therein to one or more assignees or participants.  Borrower shall execute, acknowledge and deliver any and all instruments reasonably requested by Lender in connection therewith, and to the extent, if any, specified in any such assignment or participation, such assignee(s) or participant(s) shall have the same rights and benefits with respect to the Loan Documents as such Person(s) would have if such Person(s) were Lender hereunder.  Lender may disseminate any information it now has or hereafter obtains pertaining to the Loan, including any security for the Loan, Borrower, any of Borrower's principals or any Guarantor, to any actual or prospective assignee or participant, to Lender's affiliates, to any regulatory body having jurisdiction over Lender, to any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Lender and the Loan, or to any other party as necessary or appropriate in Lender's reasonable judgment.

[signature page follows]

IN WITNESS WHEREOF, the authorized representatives of the parties have executed this Loan Agreement as of the date first written above.

**JB&B Capital, LLC**

By: *Danyele Miller* (DocuSigned by: 053E7D030172461...)
Name: Danyele Miller
Title: CFO

[Signature Page to Loan Agreement]

IN WITNESS WHEREOF, the authorized representatives of the parties have executed this Loan Agreement as of the date first written above.

**BORROWER:**

SQRL Aviation, LLC

By: *Joseph B. Smith* (DocuSigned by: A3EB439972E74A1...)
Name: Joseph B. Smith
Title: Manager of SQRL Holdings, LLC, Manager of SQRL Aviation, LLC

**GUARANTORS:**

*Joseph B. Smith* (DocuSigned by: A3EB439972E74A1...)
JOSEPH B. SMITH

SQRL Holdings, LLC

By: *Joseph B. Smith* (DocuSigned by: A3EB439972E74A1...)
Name: Joseph B. Smith
Title: Manager

[Signature Page to Loan Agreement]